[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff alleges that it provided a steel expansion joint to Ultimate Concrete Co., Inc. (Ultimate) to be used in a bridge rehabilitation being performed by Ultimate in its capacity as a general contractor doing work for the State of Connecticut. Upon Ultimate's refusal to pay Merrimack on the grounds that the joint was defective and not in compliance with specifications, Merrimack sued Vigilant Insurance Co., which had provided a payment bond to protect entities providing material and labor for the contract in question.
In this case, the Court finds the issues in favor the defendant for the following reasons.
In July, 1992, Ultimate and Merrimack contracted for Merrimack to supply the expansion joint in question. At that point Merrimack had shop drawings prepared which were to be used in actually making the joint. Merrimack contracted with an independent designer, Ken Moore, to create the drawings. Moore made a mistake in his preparation of the drawings which ultimately led to the joint not meeting specifications and being unusable as supplied. Moore's error resulted in the joint, when placed in the bridge, protruding several inches above the travel surface, which would have created an unsafe condition for vehicular traffic and a danger to snow plowing operations during the winter season. The part, as delivered, was unacceptable and rejected by the engineer in charge.
Merrimack has two essential claims. First, it claims the error was not theirs, at least not in its entirety, because once the shop drawings were completed by Moore, Merrimack sent them to Ultimate, who in turn sent them to the Connecticut Department of Transportation (DOT), who in turn approved them. CT Page 5256-KKKKKK
The drawings were approved by the DOT's consulting engineering firm with the following language:
 "This drawing has only been checked for conformance with the design concept of the project and compliance with the information given in the contract document. Contractor is responsible for dimensions to be confirmed and correlated at the job site; for information that pertains solely to the fabrication processes or to techniques of construction, and for coordination of the work of all trades."
As a general contracting company Ultimate does not have its own engineers, and did not check the shop drawing, relying on Merrimack's expertise and the DOT engineers. Between these parties, it was Merrimack's responsibility to provide a product in conformity with plans and specifications on which it bid. This it failed to do. In that respect it breached its contract with Ultimate and not vice versa.
Secondly, Merrimack argues that even if it was its error that caused the defect, it was not given a chance to correct it when it could have reasonably done so.
It normally takes six to eight weeks from the approval of the shop drawings to the delivery of an expansion joint. In this case, the drawings were approved at the end of August. There was some delay caused by Merrimack's inability to get the steel plate specified and in getting approval of a substitute size. While the contract called for delivery ASAP, no specific date was specified.
It is, however, known in the industry that road projects must be completed before snow falls. Asphalt plants shut down and it becomes imperative that such projects be complete before that happens. In this case, the required paving was done well before that, and the old joint left in place until sometime in November. In anticipation of the delivery of the new joint, the old one was removed and the hole was temporarily filled with wood beams covered by plywood. The lateness of the season prompted Ultimate to communicate multiple times concerning the urgency of delivering the product. On November 11, 1992, the part was delivered to the bridge site. Snow was already on the ground at that time. According to DOT records, Ultimate began installing the joint on November 18, 1992. The joint is approximately 60' CT Page 5256-LLLLLL long and came in four sections. A crane is required to lift each section into place. On November 24, 1992, when Ultimate (actually a subcontractor for Ultimate) tried to install the fourth piece, it found it to be defective. While the Court does not conclude the delay in shipping the part so late as to constitute a breach of contract, it was a reasonable factor in Ultimate's decision to not permit the plaintiff to correct its defect.
The delay from the time of delivery to installation was not untoward. Ultimate had little advance notice of delivery. The part had to be checked over by the engineers before installation and arrangements made for the installation crew to be available. Ultimate did not unreasonably delay the installation.
When the section did not fit, Ultimate and its people tried several ways to make it fit. After all efforts to make the joint fit were unsuccessful, meetings were held between Ultimate, DOT and the consulting engineers, but no viable solution was found.
On December 3rd, Ultimate faxed Merrimack that a problem existed and on December 4th Donald Dussault, an owner of Merrimack came to the site. He quickly ascertained, by comparing the construction drawings to the shop drawings which he had prepared, that the shop drawing was incorrect and the joint was, accordingly, defective.
He proposed to take the joint back to New Hampshire, repair it, and return it to the site. He said the repairs could be done in one day.
At that point (December 4th) time was critical. First of all arrangements would have to be made to get a truck to the site, move the piece to New Hampshire, return the piece and get it installed. While Merrimack said the repairs could be made in one day, Ultimate thought that was problematic, especially in light of longer than the industry standard for initial delivery. Further, that proposal was not automatically acceptable. The proposed correction would have to be submitted to the DOT and its project engineers for approval. An engineer would have to go to New Hampshire to oversee the work being done. Winter weather was now a critical factor. With the snow season, the bridge was unsafe for traffic and plowing equipment. For these reasons, Ultimate decided to use an alternate type of joint called a thermo joint. This alternate method met the approval of the project engineers. It could be installed without delay and with CT Page 5256-MMMMMM the certainty that the job would be completed minimizing potential harm to the public.
The Court finds that under the circumstances of this case, Ultimate did not act unreasonably in rejecting Merrimack's proposal to correct the defective part.
Judgment shall enter for the defendant.
Klaczak, J.